IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     -vs-<br><br>RAFAEL VILLEGAS,<br><br>              Defendant. | **ORDER AND**<br><br>**MEMORANDUM DECISION**<br><br><br>Case No.  2:05-cr-891 TC |

Defendant Rafael Villegas has filed a Motion to Suppress Evidence seized from his vehicle, arguing that the evidence was discovered in violation of his Fourth Amendment rights.

The court finds that Mr. Villegas voluntarily consented to the searches he now challenges, and furthermore, the police had probable cause to take Mr. Villegas's vehicle to an automobile repair shop for an in-depth search.

The court DENIES Mr. Villegas's motion to suppress.

### FINDINGS OF FACT[1]

Utah Highway Patrol Trooper Michael Bradford has extensive training in narcotics interdiction and has been personally involved with fifteen large pipeline seizures.

On June 12, 2005, he was waiting off State Road 191 in Blanding, Utah, a large drug trafficking corridor.  Many accidents occur on that stretch of State Route 191 because of fatigued drivers.  At approximately 2:40 p.m., Trooper Bradford observed a Silver Mercury Grand

---

[1]All evidence is taken from the evidentiary hearing on Mr. Villegas's motion to suppress, held on May 4, 2007.

Marquis drive on the fog line for approximately twenty feet, and he believed the Mercury's windows were tinted more than allowed under Utah law. The trooper pulled the vehicle over.

When he walked to the driver's side of the Mercury, Trooper Bradford noticed an air freshener with a picture of the Virgin Mary on it, as well as an American flag sticker in the rear window. The trooper informed Mr. Villegas—the driver and the only person in the Mercury—that he wanted to make sure Mr. Villegas was not fatigued because he had failed to stay in his lane. Trooper Bradford also informed Mr. Villegas that the windows appeared to be too dark.

While asking for Mr. Villegas's driver's license, registration, and insurance, Trooper Bradford noticed that Mr. Villegas's hands were shaking. The trooper also noticed a cannister air freshener below the console, an air freshener hanging from the brake pedal, two additional hanging air fresheners lying on the rear floorboards, a bottle of cologne in the cup holder next to the driver, a figurine of Jesus and the Virgin Mary glued to the dashboard, and a Virgin Mary necklace hanging from the rearview mirror. From outside the driver's window, Trooper Bradford detected the odor of cologne, leading the trooper to believe cologne had recently been sprayed. Additionally, Trooper Bradford noticed that Mr. Villegas's key chain had only two keys.

As Mr. Villegas gathered his license, registration and insurance information, Trooper Bradford inquired about his travels. Mr. Villegas explained that he was driving from Tucson to Denver for a one week visit with his father. And when the trooper asked about the Mercury's ownership, Mr. Villegas answered that he was the owner. Trooper Bradford was impressed with Mr. Villegas's English, and complimented him. Mr. Villegas explained that he had been in the

United States for eighteen years, then provided his Arizona driver's license and proof of registration.

Trooper Bradford took Mr. Villegas's documentation to his patrol car and called dispatch. While waiting for the information to be verified, he motioned for Mr. Villegas to join him in his patrol car. Once in the patrol car, Mr. Villegas became increasingly more nervous, even after Trooper Bradford informed him that he would only receive a written warning.

While Mr. Villegas was still in Trooper Bradford's car, Trooper Charlie Taylor arrived to provide backup. Parking behind Trooper Bradford's car, Trooper Taylor walked up to Trooper Bradford's passenger window and started a conversation with Mr. Villegas while Trooper Bradford filled out the warning. During this discussion, Mr. Villegas told Trooper Taylor that he was coming from Mesa and going to Denver to meet a couple family members. Because Mr. Villegas had previously told Trooper Bradford that he was coming from Tucson to see his father, Trooper Bradford interjected and asked additional questions about Mr. Villegas's plans. But Mr. Villegas appeared to no longer understand Trooper Bradford, answering several questions with "no comprende." (Tr. of May 4, 2007 Evidentiary Hr'g, 26.) At that time, Trooper Taylor walked to the front of his own vehicle, and waited behind Trooper Bradford's patrol car.

With Mr. Villegas still sitting in the patrol car, Trooper Bradford handed him the written warning. Trooper Bradford then returned the rest of the documentation and told Mr. Villegas he was free to leave and to "have a good day." (Id. at 122.) As Mr. Villegas opened the passenger door to get out of the patrol car—with one leg and one arm outside—Trooper Bradford asked Mr. Villegas if he could ask some additional questions. While making the request, Trooper Bradford apparently raised his left hand with an open palm to approximately the level of his own chest.

3

Mr. Villegas answered yes to the additional questioning and sat back down in Trooper Bradford's patrol car, leaving the passenger door slightly ajar. The trooper then asked Mr. Villegas if he had anything illegal in his car, if he had any weapons, if he had marijuana, or if he had cocaine, and Mr. Villegas answered all in the negative. Then—approximately fifteen to twenty minutes after the initial stop—Trooper Bradford asked if he could search the Mercury. Mr. Villegas answered "yeah." (Id. at 27.) To verify that Mr. Villegas's consent to the search was voluntary, Trooper Bradford asked Mr. Villegas if he understood, to which Mr. Villegas answered affirmatively. Before searching the vehicle, Trooper Bradford told Mr. Villegas he could stand about twenty yards in front of the Mercury, so he could see the car during the search. But Mr. Villegas chose to face away from the vehicle and never turned to face his car during the entire search.

Trooper Bradford, along with Trooper Taylor, started to search the Mercury. Initially, they found two additional spray bottles of air freshener. In the trunk, they found a backpack with clothing for one day. And approximately thirty minutes after stopping Mr. Villegas's car, Trooper Bradford looked underneath the vehicle. Because he had worked in his father's mechanic shop for several years, Trooper Bradford was very familiar with cars. He quickly noticed that the gas tank had been altered or removed. The straps were bent and loose, there were fresh tool marks on the bolts, there were new rubber fuel lines and hose clamps on the tank, and the strap bolts were different lengths. Trooper Bradford believed there was contraband in the gas tank. He also noticed "sloppy" welding on the left muffler—indicating that muffler had been installed after the vehicle was released from the factory. (Id. at 33.) Additionally, the left muffler was colder to the touch than the right muffler. After seeing all this, Trooper Bradford concluded that if the muffler actually had worked, it would have made the car "a bomb

basically." (Id. at 34.) But, as the trooper explained, he was so focused on the gas tank that he did not ask Mr. Villegas about the muffler, he only asked Mr. Villegas when he had last removed the gas tank. Mr. Villegas answered that he had not removed the gas tank in the one year he had owned the Mercury.

At that point, Officer Corey Workman and Officer Darren Shumway arrived with Officer Shumway's dog in tow. Although the dog was still in training to become a drug detection dog, Officer Shumway—not yet certified himself to deploy detection dogs—had his dog circle Mr. Villegas's car. The dog did not indicate that it detected any contraband. Officer Shumway and Officer Workman left, and another trooper, Sanford Randall, arrived with his dog. Trooper Randall's dog also gave no indication that it detected contraband.[2] Trooper Randall and Trooper Taylor left. Finally, Deputy Jaron Adams arrived, leaving only Trooper Bradford and Deputy Adams at the scene.

While Deputy Adams waited in his own patrol car, Trooper Bradford explained to Mr. Villegas that based on the apparent tampering with the gas tank—despite the negative dog sniffs—the trooper believed that there might be contraband in the Mercury. Trooper Bradford asked if Mr. Villegas would be willing to follow him to a local mechanic shop and Mr. Villegas said "[y]eah, go ahead." (Id. at 42.) After learning that the nearest available mechanic shop was twenty-two miles away, in Monticello, Utah, the trooper asked Mr. Villegas if he would be willing to drive that far. Mr. Villegas consented.[3] So the trooper drove his patrol car to

---

[2] It is not clear from the record whether Trooper Randall and his dog were certified to detect contraband.

[3] The parties sharply dispute this point. But the court finds—after having observed and heard Trooper Bradford testify—that Trooper Bradford was a reliable and credible witness, and

Monticello, with Mr. Villegas driving his Mercury behind Trooper Bradford, and Deputy Adams following Mr. Villegas in his own patrol vehicle.

When they arrived at the mechanic shop, Mr. Villegas watched as Trooper Bradford and Deputy Adams put the Mercury on a hoist and searched the undercarriage.  With the car raised, Trooper Bradford felt the two mufflers—observed that the right muffler was hot and the left muffler was cold—and reached over the left muffler to discover a cut-out.  Reaching into the hole, Trooper Bradford touched a package which he believed to contain controlled substances and placed Mr. Villegas under arrest.  The mechanic then removed the left muffler, revealing a total of five packages which appeared to contain narcotics.  A field test of one package confirmed that it contained cocaine.

Although the trooper eventually searched the gas tank, there were no drugs.  Trooper Bradford also tested the Mercury's windows with two different instruments.  Both tests revealed the windows were darker than permitted by Utah law.

On the date of Mr. Villegas's arrest, Trooper Bradford's vehicle was equipped with video and audio recording equipment.  The video recorded images directly in front of the trooper's vehicle, and the audio recorded only what occurred inside his vehicle.  Trooper Bradford often reuses his tapes, recording recent traffic stops over old traffic stops.  He understands that the policy of the Utah Highway Patrol is to keep tapes for one year and then reuse them unless a case is pending or an attorney requests the tape before he reuses it.  Because Mr. Villegas pled guilty in state court on July 19, 2005, Trooper Bradford believed the matter was resolved.  Accordingly,

---

accepts his testimony that Mr. Villegas consented to the search despite Mr. Villegas's testimony that he told the trooper that "[i]t's already been too long.  I cannot go," and that the trooper responded "[y]ou have to go."  (Tr. of May 4, 2007 Evidentiary Hr'g, 124.)

6

some time after June 12, 2006—one year after he stopped Mr. Villegas—the trooper recorded over the tape of Mr. Villegas's traffic stop. The trooper heard nothing more about this case until early spring of 2007, when Officer Townsend requested the tape for this federal case. But at that point, Trooper Bradford had already reused the tape.

## ANALYSIS

Mr. Villegas asks the court to suppress the evidence seized from his vehicle arguing the warrantless search and seizure violated the Fourth Amendment protections "against unreasonable searches and seizures." U.S. Const. amend. IV.

Supporting his motion on two bases, Mr. Villegas argues that the government violated his Fourth Amendment because: (1) his consent to Trooper Bradford's additional questioning was not voluntary; and (2) he did not consent to go to Monticello for the additional search.[4]

**I.      Mr. Villegas Voluntarily Consented to Trooper Bradford's Additional Questioning**[5]

With consent, the police may detain a driver longer than necessary for the initial traffic stop. United States v. Chavira, 467 F.3d 1286, 1290 (10th Cir. 2006) ("[W]e have held that a 'driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning.'") (quoting United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)) (emphasis added). To determine whether an encounter was consensual, courts consider if a reasonable person would have felt free to leave

---

[4]The parties do not dispute that Mr. Villegas, the registered owner of the Mercury, has standing to challenge the alleged Fourth Amendment violations.

[5]Mr. Villegas does not challenge the validity of the initial stop, or the validity of the detention before Trooper Bradford asked Mr. Villegas if he could ask additional questions.

considering the totality of the circumstances. United States v. Manjarrez, 348 F.3d 881, 885 (10th Cir. 2003) ("Whether an individual consents to further questioning is based on the totality of the circumstances."); United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996) ("Whether an encounter is a detention or a consensual encounter depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter."). A "consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." Hernandez, 93 F.3d at 1498. Applying this test, a "traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000).

Here, Mr. Villegas testified that Trooper Bradford had returned all of Mr. Villegas's documentation and told Mr. Villegas to have a good day. Mr. Villegas also testified that the trooper asked for permission to ask additional questions, and that Mr. Villegas answered "yes," then sat back down in the passenger seat with the door still open. (Tr. of May 4, 2007 Evidentiary Hr'g, 122.)

But Mr. Villegas still argues that this consent was not voluntary because Trooper Bradford raised his left hand—the hand that was away from Mr. Villegas—to about the level of his own chest when he asked Mr. Villegas if he may ask additional questions.[6] Based on this hand gesture, Mr. Villegas contends, "a reasonable person would not have felt free to leave."

---

[6]Trooper Bradford does not recall whether he used a hand gesture when asking permission to ask additional questions. (Tr. of May 4, 2007 Evidentiary Hr'g, 90.)

(Def.'s Mem. Supp. at 8-9.)

During the evidentiary hearing, Mr. Villegas demonstrated Trooper Bradford's gesture to the court. After this demonstration, Mr. Villegas explained that he was able to provide an accurate enactment of the gesture even though his mobility was severely hampered by handcuffs and chains. (Tr. of May 4, 2007 Evidentiary Hr'g, 123 ("I was able to demonstrate [Trooper Bradford's hand gesture] well.").) The court did not find Mr. Villegas's demonstration indicative of a showing of authority, but found the demonstration more akin to a vague, inconsequential hand gesture. And although Mr. Villegas thought the trooper's motion "meant for me to stop, for me not to leave," (id. at 122), the Tenth Circuit has explained that his subjective understanding is not relevant because a "person is seized only when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way." Hernandez, 93 F.3d at 1498.

Additionally, all the credible evidence indicates Trooper Bradford was polite and pleasant when he made his request. See United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006) ("point[ing] to other factors as evidence that an encounter was consensual, including an officer's pleasant manner and a tone of voice that is not insisting, a public location such as the shoulder of an interstate highway, in public view, and the prompt return of the defendant's identification and papers.") (quotations and citations omitted). There is no claim that Trooper Bradford touched Mr. Villegas, displayed a weapon, or used a commanding tone or intimidating body language. See Chavira, 467 F.3d at 1291-92 ("[A]n objectively reasonable basis to believe he is not free to go. . . . may be supported by the presence of more than one officer, the display of a weapon, the physical touching of the detainee, the officer's use of a commanding tone of voice, and the

9

officer's use of intimidating body language."). In fact, the trooper's uncontradicted testimony is that he did not raise his voice, draw a weapon, or touch Mr. Villegas. And only one other officer—Trooper Taylor—was present at that time, and he was waiting behind Trooper Bradford's patrol car.

Consequently, the court concludes that Trooper Bradford's hand gesture was not a coercive show of authority. A reasonable person would have felt free to leave and Mr. Villegas's consent was voluntarily given. Because Mr. Villegas voluntarily consented to additional questioning, the prolonged detention was not unreasonable under the Fourth Amendment.[7]

## II. The Monticello Search Was Lawful

Because Trooper Bradford offered credible and reliable testimony that Mr. Villegas consented to driving his Mercury to Monticello, the continued search there was lawful. And in any event, there was probable cause to support that search.

Trooper Bradford testified that Mr. Villegas agreed to drive his Mercury to Monticello for additional searching. During cross-examination by Mr. Villegas's attorney, the trooper explicitly testified that Mr. Villegas never complained about the duration of the search of the car or about driving to Monticello. Mr. Villegas's contradictory testimony was not particularly persuasive. Accordingly, the court concludes that Mr. Villegas voluntarily drove his car to Monticello for additional searching. See United States v. Taverna, 348 F.3d 873, 877 (10th Cir. 2003) ("At a hearing on a motion to suppress, the district judge assesses the credibility of witnesses and determines the weight to be given to the evidence."). Because it was voluntary, Mr. Villegas's

---

[7]There is no dispute that after the trooper asked a few questions, Mr. Villegas gave Trooper Bradford voluntary consent to search the Mercury.

driving his Mercury to Monticello was reasonable under the Fourth Amendment.

But even without Mr. Villegas's permission, Trooper Bradford had probable cause to justify the additional search. "Under the automobile exception, a warrantless search is permissible if there is probable cause to believe that the vehicle contains contraband." United States v. Chatman, 994 F.2d 1510, 1514 (10th Cir. 1993). With probable cause, the police have authority to move a vehicle to another location to continue a search. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1261 (10th Cir. 2006) (with probable cause, "transportation of the car to the sheriff's department and subsequent search was therefore lawful."). "'Probable cause to search a vehicle is established if, under the totality of the circumstances there is a fair probability that the car contains contraband or evidence.'" United States v. Jurado-Vallejo, 380 F.3d 1235, 1238 (10th Cir. 2004) (quoting United States v. Nielsen, 9 F.3d 1487, 1489-90 (10th Cir. 1993)).

Trooper Bradford's observations about Mr. Villegas's altered gas tank lead him to believe that the gas tank held a hidden compartment. The Tenth Circuit recently explained "that visual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search." Ledesma, 447 F.3d at 1317. To determine whether a hidden compartment establishes probable cause, courts first consider the likelihood that there is a hidden compartment, then consider the likelihood such a compartment would conceal contraband. Jurado-Vallejo, 380 F.3d at 1238 ("Whether probable cause to search a vehicle can be based on evidence of a hidden compartment depends on two factors: (1) the probative value of the evidence—that is, the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband.").

Here, Trooper Bradford's observations suggested a strong possibility of a hidden compartment underneath the Mercury which concealed contraband. Relying on his extensive experience as an auto mechanic, as well as his experience and training in narcotics interdiction, the trooper noticed that someone had recently tampered with the gas tank. The fresh tool markings and the new rubber fuel lines and hose clamps, as well as the fact that the strap bolts were different lengths, all indicated a recently altered gas tank. And Mr. Villegas told the trooper he had never altered or removed the gas tank, reducing the likelihood of a valid explanation for the tampering. The trooper testified that the tampered gas tank evidenced the presence of a hidden compartment because gas tanks are often used for that purpose.[8]

Additionally, there was other evidence that Mr. Villegas possessed contraband.

First, the after-market second muffler appeared inoperable to Trooper Bradford, revealing another likely hidden compartment.[9]

Second, Trooper Bradford found a backpack in the trunk of the car with only one set of clothing. Because Mr. Villegas told the trooper that he was traveling from Tucson to Denver to

---

[8] The Tenth Circuit has explained that a hidden compartment likely conceals contraband because "it is hard to conceive of a legitimate use for a large hidden storage compartment in any vehicle . . . ." Jurado-Vallejo, 380 F.3d at 1238.

[9] In an attempt to impeach Trooper Bradford's testimony that the left muffler was cooler than the right muffler, Mr. Villegas submitted an affidavit from Greg Markham the day before final argument. The affidavit purported to provide evidence about the cooling speed of steel frames surrounding mufflers. But the court finds this evidence unpersuasive. In addition to the significant problem that Mr. Markham is not an expert, and does not profess to have a background in auto mechanics, there is no indication that this test was performed under similar conditions to those conditions under which Trooper Bradford felt the mufflers. Because the court found Trooper Bradford's testimony credible and found him to be a reliable witness, the court does not find the affidavit sufficient to contravene the trooper's testimony that he felt the mufflers and noticed that the left muffler was cooler than the right muffler.

visit his father for a week, having only one set of clothing was strange. And Mr. Villegas contradicted himself when he told Trooper Taylor that he was coming from Mesa and going to Denver to meet a couple family members, further undermining the likelihood he was traveling for legitimate reasons.

Third, Mr. Villegas had apparently taken extraordinary steps to mask odors in the car, and there is no dispute that controlled substances emit strong smells. There were a number of air fresheners and it appeared that Mr. Villegas had recently sprayed cologne in the car.

Fourth, Mr. Villegas was driving on a stretch of road known as a drug corridor and his key chain contained only two keys rather than the numerous keys typically found on a key ring.

And finally, Mr. Villegas became increasingly nervous during the stop, even after he learned that he would only receive a written warning.

Based on the totality of the evidence, Trooper Bradford had probable cause to take the car to Monticello for an in-depth search.

## CONCLUSION

For the foregoing reasons, Mr. Villegas's Motion to Suppress Evidence (dkt. #62) is DENIED.

SO ORDERED this 27th day of July, 2007.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge